2013–1625, –1631, –1632, –1633

# United States Court of Appeals for the Federal Circuit

ERICSSON, INC. and TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiffs-Appellees,*

v.

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC.,
ACER AMERICA CORPORATION, and GATEWAY, INC.,

*Defendants-Appellants,*

and

DELL, INC.,

*Defendant-Appellant,*

and

TOSHIBA AMERICA INFORMATION SYSTEMS, INC. and TOSHIBA CORPORATION,

*Defendant-Appellants,*

and

INTEL CORPORATION,

*Intervenor-Appellant,*

and

BELKIN INTERNATIONAL INC.,

*Defendant.*

Appeal from the United States District Court for the Eastern District of Texas
in case no. 10–CV–0473, Chief Judge Leonard Davis

**BRIEF OF AMICI WI-FI CHIP COMPANIES BROADCOM CORPORATION,
MARVELL SEMICONDUCTOR, INC., AND MEDIATEK INC. SUPPORTING APPELLANTS**

Dan L. Bagatell
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Phone: (602) 351–8250
E-mail: DBagatell@perkinscoie.com

Amanda Tessar
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado 80202
Phone: (303) 291–2357
E-mail: ATessar@perkinscoie.com

Counsel for Broadcom Corporation

December 23, 2013

[counsel for other amici listed on inside cover]

Donald M. Falk
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
Palo Alto, California 94306
Phone: (650) 331–2030
E-mail: dfalk@mayerbrown.com

Counsel for Marvell Semiconductor, Inc.

Steven C. Holtzman
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, California 94612
Phone: (510) 874–1001
E-mail: sholtzman@bsfllp.com

Counsel for MediaTek Inc.

# CERTIFICATES OF INTEREST

Counsel for amicus curiae Broadcom Corporation certifies the following:

The full name of every party or amicus curiae represented by me is:

Broadcom Corporation

The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Broadcom Corporation

All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

n/a

The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or are expected to appear in this Court are listed below.

PERKINS COIE LLP

Dan L. Bagatell             Amanda Tessar

Dated:  December 23, 2013        /s/Dan L. Bagatell
                                 Dan L. Bagatell

Counsel for amicus curiae Marvell Semiconductor, Inc. certifies the following:

The full name of every party or amicus curiae represented by me is:

Marvell Semiconductor, Inc.

The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Marvell Semiconductor, Inc.

All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Marvell Semiconductor, Inc. is a subsidiary of Marvell Technology, Inc. and Marvell Israel Ltd., and is an indirect subsidiary of Marvell Technology Group, Ltd.

The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or are expected to appear in this Court are listed below.

MAYER BROWN LLP

Donald M. Falk

Dated: December 23, 2013          /s/Donald M. Falk
                                  Donald M. Falk

– ii –

Counsel for amicus curiae MediaTek Inc. certifies the following:

The full name of every party or amicus curiae represented by me is:

<div align="center">MediaTek Inc.</div>

The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

<div align="center">MediaTek Inc.</div>

All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

<div align="center">n/a</div>

The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or are expected to appear in this Court are listed below.

<div align="center">

Boies, Schiller & Flexner LLP

Steven C. Holtzman

</div>

Dated: December 23, 2013      /s/Steven C. Holtzman
<div align="right" style="margin-right:35%">Steven C. Holtzman</div>

# TABLE OF CONTENTS

Certificates of Interest.................................................................i

Table of Authorities .................................................................v

Table of Abbreviations and Conventions ................................vi

Introduction..............................................................................1

Statement of Interest ................................................................3

Argument:  The Damages Award Defies Both RAND and Commercial Reality.....5

Conclusion ..............................................................................14

Certificate of Compliance.......................................................15

Certificate of Authorization and Proof of Service.................16

# TABLE OF AUTHORITIES

**Cases**          **Pages**

*In re Innovatio IP Ventures, LLC Patent Litig.,*
    MDL No. 2303, No. 11 C 9808,
    2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) ....................................8, 12

*Microsoft Corp. v. Motorola, Inc.,*
    No. C10-1823, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) .....................12

*Uniloc USA Inc. v. Microsoft Corp.,*
    632 F.3d 1292 (Fed. Cir. 2011) ....................................................7, 11

*Versata Software, Inc. v. SAP Am., Inc.,*
    717 F.3d 1255 (Fed. Cir. 2013) ........................................................6

## Other Authorities

*Ericsson's Response to FTC Request for Comments,* FTC Standard Setting
    Workshop, http://www.ftc.gov/sites/default/files/documents/
    public_comments/ request-comments-and-announcement-workshop-
    standard-setting-issues-project-no.p111204-00049%C2%A0/00049-
    80189.pdf .................................................................................11

Ben James, *CSIRO to Rake in $230M After WLAN Patent Settlements*
    (Apr. 2, 2012), http://www.law360.com/articles/325568 ...........................12

Abhiram Nandakumar, *Wi-LAN and Broadcom to Settle Patent Lawsuits*
    (Jan. 20, 2011), http://www.reuters.com/article/2011/01/20/ us-wilan-
    idUSTRE70J6BT20110120 ..........................................................13

Telefonaktiebolaget LM Ericsson,
    *Comments to the European Commission's Workshop on Intellectual*
    *Property Rights and ICT Standards* 9 (November 2008) ..........................11

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| A___ | joint appendix page |
| IEEE | Institute of Electrical and Electronics Engineers |
| OEM | original equipment manufacturer |
| RAND | reasonable and non-discriminatory |

# INTRODUCTION[1]

To those unfamiliar with the Wi-Fi industry, the 15¢ per unit royalty awarded in this case may seem unremarkable. Understood in context, however, it is grossly excessive and unreasonable. If upheld, it would undermine the success of the now-ubiquitous 802.11 standard, impede widespread proliferation of Wi-Fi chips, and discourage investment and innovation in wireless communications.

Amici Wi-Fi Chip Companies are leaders and innovators in designing and selling semiconductor chips for wireless communications, including chips that comply with the Wi-Fi standard. Collectively, amici account for nearly two thirds of worldwide sales of Wi-Fi chips.

The parties in this case agreed that the 802.11 standard was defined and implemented at the semiconductor chip level, not at the level of routers, laptops, or other OEM products incorporating those chips. Ericsson chose to target OEMs rather than the Wi-Fi chip companies that supply the OEMs because Ericsson hoped to extract greater royalties based on the higher prices of end-user devices. Nevertheless, if the award in this case were affirmed, it could have a grievous effect on Wi-Fi chip companies—and the Wi-Fi industry as a whole.

---

[1] Because Ericsson has not consented to the filing of this brief, amici have submitted a motion for leave to file it. No party or counsel for a party has authored this brief in whole or in part, and no one other than amici and their counsel has contributed any money intended to fund the preparation or submission of this brief.

As detailed below, the math is straightforward. Over 2½ billion Wi-Fi chips will be sold in 2014, but prices are low (about a dollar or two per chip) and profits are thin (in many cases even less than 15¢ per unit royalty awarded here). Multiplying a 15¢ per unit royalty by 2½ billion units implies a royalty of $375 million for a single patentee for a single year. Within the next five years, Wi-Fi chip sales are expected to grow to four billion chips per year, and that royalty would grow to $600 million per year. That suggests a cumulative royalty reaching billions of dollars within just a few years, a grossly outsized reward for a plaintiff that concededly had almost nothing to do with the creation, development, or implementation of the 802.11 standard and whose three patents concededly address only limited aspects of one version of the standard.

Indeed, the award here is especially disturbing because it covers only three patents, yet experts estimate that 3,000 or more U.S. patents (not to mention foreign counterparts) may be essential to the 802.11 standard. Conservatively assuming that only 3,000 patents are standard-essential and that the three patents in this case were typical, the 15¢ royalty awarded here would translate to a total royalty stack of $150 per unit—even though the Wi-Fi chips where the 802.11 standard is actually implemented currently sell for only a dollar or two. In any event, even without taking royalty stacking into account, the 15¢ royalty applied by the district court exceeds the entire current profit margins on many Wi-Fi chips.

– 2 –

In short, although a 15¢ royalty rate may seem innocuous at first blush, it is unreasonable when evaluated in the correct context, and it would pose an unsustainable burden on an industry that pressed for and supported standardization precisely so that Wi-Fi technologies would be affordable, interoperable, and broadly available. As companies that helped lead the development of the 802.11 standard and have continued to invest heavily in the Wi-Fi industry, amici strongly urge the Court to consider these realities and the impact that affirmance of the award here would have on further innovation in and development of this important industry. Even if liability is affirmed, the damage award should be overturned.

## STATEMENT OF INTEREST

Amici have a strong interest in this appeal because any ruling regarding the RAND royalty rate for standard-essential Wi-Fi patents would inevitably affect amici and the Wi-Fi industry as a whole.

As Ericsson acknowledged in this case [A1301], Wi-Fi chip companies were and are leaders in developing the 802.11 standard and Wi-Fi technology. Broadcom, for example, spends over $2 billion per year on research and development (third highest in the semiconductor industry), and it has invested hundreds of millions of dollars developing and implementing 802.11 technologies in particular. Broadcom participated actively throughout the 802.11 standard-setting process, and its representatives chaired the subcommittee responsible for producing the

802.11n standard at issue here. Marvell is also a leading designer of Wi-Fi and other semiconductor chips. Marvell has contributed to the development of 802.11 standards, and its products have won numerous awards from the technical community for their innovation. MediaTek, the largest semiconductor chip supplier in Asia, is also a Wi-Fi chip industry leader. It too has been an active contributor in the setting of IEEE 802.11 standards, with representatives contributing to and chairing subcommittees and working groups. Collectively, amici hold tens of thousands of U.S. and foreign patents, including hundreds of patents involving the 802.11 standard. By contrast, Ericsson was only peripherally involved in developing the 802.11 standard: it made only a single contribution to one version of the standard, and it did not chair any working group or task force. [A1619-20]

Not surprisingly, the undisputed evidence showed that the 802.11 standard was defined and implemented at the semiconductor chip level, not at the level of OEM products incorporating those chips. [A1296-97] Indeed, Ericsson's expert acknowledged that the accused functionality resided in the Wi-Fi chips inside the defendants' products and thus that Wi-Fi chips were "all that matter[ed]" in this case. [A1403] Ericsson chose to target OEMs rather than amici and other Wi-Fi chip companies in hopes of extracting greater royalties at the OEM level due to the higher prices of end-user devices. [A1331] But the award in this case is nevertheless important to amici and everyone associated with the Wi-Fi industry.

The OEMs that Ericsson has targeted are customers or potential customers of amici, and royalties imposed for technology implemented at the Wi-Fi chip level will necessarily affect amici and others that supply those chips. In some cases, Wi-Fi chip companies may face demands for reimbursement or indemnification, and even if OEMs raised prices of their own products to cover higher royalties, demand for Wi-Fi chips would be affected by royalty awards of this magnitude. In any case, affirmance of the award here would disrupt the basic economics of the Wi-Fi industry by imposing royalties that would consume the profits of Wi-Fi chip companies that have developed and implemented the 802.11 standard. Royalties of this magnitude—and the risk of still more royalties resulting from additional opportunistic lawsuits—would threaten the ability of Wi-Fi chip companies to continue to invest in researching and developing future generations of Wi-Fi technology. And that, in turn, would limit the widespread availability of affordable Wi-Fi products to the detriment of everyone, including consumers.

## ARGUMENT:

### THE DAMAGES AWARD DEFIES BOTH RAND AND COMMERCIAL REALITY

Amici agree with appellants that a proper RAND analysis must focus on and within the Wi-Fi chips that go into OEMs' end products, not on the end products themselves. That is not only because the accused functionality resides within the Wi-Fi chips, but also because those chips are the highest level at which the Wi-Fi

standard was designed. To determine whether a royalty satisfies the RAND

standard to which all technology contributors committed during the IEEE standard-

setting process, one must analyze the royalty at a level no higher than the Wi-Fi

chip.[2] Compliance with the RAND commitment should not be evaluated at the

level of routers, laptops, and other OEM products containing innumerable other

components and technologies.[3]

As noted above, Ericsson chose to target OEMs rather than Wi-Fi chip com-

panies because it hoped to extract greater royalties at the OEM level. [A1331] But

as appellants explain, Ericsson's effort to defend the royalty in relation to end-user

product prices conflicts with this Court's instruction that royalties should normally

be "awarded based on the smallest salable patent-practicing unit." *Versata Soft-*

*ware, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013) (recognizing that

---

[2] Indeed, Wi-Fi chips generally provide functionalities relating both to the 802.11 standard and other technologies. Accordingly, the appropriate royalty for 802.11-specific patents may need to be evaluated in relation to a component price or value smaller than the entire market value of such chips, and certainly no higher than the most basic of 802.11-compliant chips.

[3] Ericsson's suggestion that only OEMs, not Wi-Fi chipmakers, are entitled to license at the RAND rate makes no sense. Broadcom, Intel, and other Wi-Fi chip makers committed to license their own standard-essential patents on RAND terms, and they are entitled to the benefit of other participants' reciprocal promises. Indeed, if the companies that design and sell the fundamental Wi-Fi chips where the standard is implemented were not intended beneficiaries of the RAND commit-ments, it is hard to fathom who was.

the "entire market value rule" is "a narrow exception to the general rule that royalties are awarded based on the smallest salable patent-practicing unit"); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318-21 (Fed. Cir. 2011). Ericsson's analysis thus focuses on the market value of the wrong products.

Viewed from the perspective of the Wi-Fi chip where the 802.11 standard is implemented, both the 50¢ per unit Ericsson demanded and the 15¢ per unit ultimately awarded were grossly disproportionate. Evidence at trial in this case showed that the Wi-Fi chips at issue sold for an average of about $2.41 per chip in 2010, when 802.11n-compliant technology became common. [A1603] But prices of semiconductor chips decline over time. Today, basic 802.11-compliant Wi-Fi chips are highly commoditized and sell for as little as $1 per chip. [A1508; A1517; A1604] More complex Wi-Fi-compliant chips may sell for $2 or $3 per chip [A1605], but these more expensive chips are often "combo" chips that include additional, non-802.11 technologies such as Bluetooth or NFC, so that Wi-Fi capability accounts for a smaller proportion of their value.

What is more, prices of Wi-Fi chips must cover costs of developing, manufacturing, and distributing them, as well as any royalties. To gauge what a willing licensee would pay for a license in an *ex ante*, no hold-up situation, one must consider the profit margins on those chips. As one district court recently found, profit margins in the Wi-Fi chip industry have historically averaged just 9% to 15%.

*In re Innovatio IP Ventures, LLC Patent Litig.*, MDL No. 2303, No. 11 C 9808, 2013 WL 5593609, at *42 (N.D. Ill. Sept. 27, 2013) (citing ranges of 9.4 to 14.4% and adopting 12.1% as the average profit margin from 2000 to 2012). In some cases, margins are even lower.

For chips selling at $1 to $3 per chip, a 9% to 15% profit margin translates into 9¢ to 45¢ per chip. No rational seller of Wi-Fi chips would or could pay 15¢ per chip, much less the 50¢ per chip that Ericsson demanded, to license three patents allegedly covering relatively minor aspects of the standard. That is especially so when experts estimate that 3,000 or more U.S. patents may be essential to the 802.11 standard. *See Innovatio*, 2013 WL 5593609, at *43 (relying on PA Consulting's study of essential U.S. patents); *see also* A1709 (testimony that over 3,000 patents relate to 802.11n alone). Such royalties would put the parties who paid them out of business and prevent them from funding future research and development.[4]

---

[4] Notably, the problem is not limited to the 802.11n standard directly at issue in this case. Wi-Fi chips are generally backward-compatible. For example, new 802.11ac-compliant routers normally comply with older versions of the standard such as 802.11n, 802.11g, and 802.11b so that they can work with laptops and tablets designed for those older versions.

This has several implications. First, potential licensees must take into account all patents essential to all versions of the 802.11 standard, not just U.S. patents involving 802.11n. Second, licensors may argue that royalty rates for currently standard-essential patents should continue to apply in the future, even as their

(footnote continued on next page)

The gross excessiveness of Ericsson's claim and the amount awarded is even more apparent when one takes into account the volumes of Wi-Fi-compliant products sold each year. According to the most recent market data and estimates, about 2½ billion Wi-Fi chips will be sold in 2014 worldwide.[5] With the continuing boom in mobile connectivity, annual sales are projected to exceed 4 billion units within the next five years. Four billion units times a royalty of 15¢ per unit translates into a $600 million annual tax on the industry (and consumers) each year.

Moreover, that royalty burden would correspond to just three patents. Assuming these patents are of typical importance, the royalty stack for 3,000 patents essential to the 802.11 standard would be 1,000 times higher—$375 billion in 2014, and more in ensuing years as unit volumes increase. If, as appellants assert, the patents at issue here were relatively minor, the total tax would be even greater because royalties for other, more important patents would be higher. The resulting cumulative royalty loads would be staggering and unsustainable. Indeed,

---

relative importance declines with the inevitable adoption of more advanced technology in future standards and even if their patented technology is no longer essential to practice future versions of the standard.

[5] Sales in the United States account for a significant portion of worldwide sales of products containing Wi-Fi chips. Moreover, Wi-Fi-standard-essential patents commonly have foreign counterparts, and Ericsson has sought royalties from OEMs on a worldwide sales basis.

they would dwarf the value of the entire Wi-Fi chip industry, in which worldwide revenues are estimated to be little more than $5 billion per year.

The district court recognized the stacking problem as a theoretical matter but dismissed it on grounds that the defendants failed to prove that such a stacking problem already exists. That ruling was misguided for several reasons.

Most fundamentally, royalty stacking is not a retrospective, historical analysis. If it were, the first royalty imposed could never be problematic, no matter how large, whereas even a smaller, more proportionate royalty could be condemned because it happened to be imposed later. That makes no sense and would only encourage a race to the courthouse. Instead, the reasonable royalty due to Ericsson must be evaluated in light of both (a) the relative contributions that Ericsson and other companies made to the standard and (b) the cumulative royalty levels that licensees will have to pay, particularly if the royalty awarded in this case is allowed to stand as a precedent.

Indeed, Ericsson itself has promoted this very principle in its public filings addressing RAND obligations. Ericsson told the European Commission that

> individual patent holders should not set their royalty
> claims without taking into account the legitimate
> expectations of other innovators who contribute to the
> standards. Thus, each patent owner's individual
> entitlement to royalties [after the standard is adopted]
> should be reasonable in light of the proportional
> contribution of that patent owner's essential patents

compared to the total contribution of all other essential patents reading on the standard.

Telefonaktiebolaget LM Ericsson, *Comments to the European Commission's Workshop on Intellectual Property Rights and ICT Standards* 9 (November 2008).

Ericsson also urged the Federal Trade Commission to recognize that

> if the royalty levels for a standard are cumulatively too high, they will adversely impact and may negate the economic benefits of standardization. It is, therefore, important when negotiating royalty rates that individual licensors take into account the cumulative royalty levels payable by licensees[.]

*Ericsson's Response to FTC Request for Comments*, FTC Standard Setting Workshop, http://www.ftc.gov/sites/default/files/documents/public_comments/ request-comments-and-announcement-workshop-standard-setting-issues-project-no.p111204-00049%C2%A0/00049-80189.pdf, at 6. Ericsson's current suggestion that its royalty should be viewed in isolation, without regard to the royalties that the industry will owe for contributions by others, should be rejected.

The district court's analysis also ignored the burden of proof. In patent infringement cases the patent holder, not the accused infringers, bears the burden of establishing the reasonable royalty or any other form of damages. *See, e.g.*, *Uniloc*, 632 F.3d at 1315. Moreover, in this case Ericsson made binding commitments to license its patents on reasonable and non-discriminatory terms. The district court should have required Ericsson to prove that its claimed royalty was

reasonable in light of its RAND commitments and the contributions of other patent holders; it should not have put the burden on the defendants to show the opposite.

Furthermore, amici can attest that royalty stacking is a very real phenomenon, not a theoretical one. Two other district courts have already awarded royalties for standard-essential Wi-Fi patents, albeit at lower per-unit rates. Although some of the analysis and findings in those cases may be questioned, the fact of those awards confirms that royalty stacking in the Wi-Fi industry is not hypothetical.[6] In addition, amici and others have already taken licenses from various other Wi-Fi patent holders, including non-practicing entities that have targeted the Wi-Fi industry in litigation. *See, e.g.*, Ben James, *CSIRO to Rake in $230M After WLAN Patent Settlements* (Apr. 2, 2012), http://www.law360.com/

---

[6] In *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 WL 2111217, at *101 (W.D. Wash. Apr. 25, 2013), the court concluded that the RAND royalty rate for Motorola's portfolio of standard-essential 802.11 patents would have been 3.471¢ per unit for Xbox systems and 0.8¢ per unit for all other products.

In *Innovatio*, the court determined the reasonable royalty for the 19 patents deemed to be standard-essential there to be 9.56¢ per Wi-Fi chip based on a historical average chip price of $14.85. 2013 WL 5593609, at *41-43. Notably, however, that rate depended on the court's finding that the patents there were more significant than the patents at issue here. The rate in *Innovatio* also reflected the much higher Wi-Fi chip prices that prevailed in the early 2000s, when Wi-Fi was in its infancy. By contrast, this case involves 802.11n technologies produced in an era of much higher volumes and far lower prices. If the implicit 0.64% rate in *Innovatio* were applied to the 2010 price of $2.41 per Wi-Fi chip, it would produce a royalty of about 1.55¢ per unit—about a tenth of the amount awarded here. If applied to current chip prices, the rate would be less than 1¢ per unit.

articles/325568; Abhiram Nandakumar, *Wi-LAN and Broadcom to Settle Patent Lawsuits* (Jan. 20, 2011), http://www.reuters.com/ article/2011/01/20/us-wilan-idUSTRE70J6BT20110120. The industry continues to face royalty demands from many additional patent holders.

Simply put, the royalty stack is real—and would only climb higher if the royalty here is upheld because an affirmance would encourage other holders of patents purportedly essential to the 802.11 standard to swoop in and demand similarly exorbitant royalties. The district court erred in refusing to take notice of the very real stacking problems that amici and others in the Wi-Fi industry face.

This Court should not let the award in this case stand. By threatening the ability of Wi-Fi chip companies to continue to re-invest their profits in research and development for future 802.11 generations, the royalty imposed here poses a meaningful impediment to the widespread availability of affordable Wi-Fi devices. The Wi-Fi industry developed and has thrived on the premise that standardization benefits everyone and that royalties for practicing patents essential to the standard would be reasonable as well as non-discriminatory. Yet Ericsson has been awarded royalties far out of proportion to the features that its patents purport to cover and far out of proportion to the per-chip profits that amici—innovative companies that have made far greater contributions to Wi-Fi standards and technologies—earn on standard-compliant Wi-Fi chips. This Court can and should

rectify that error by holding that the district court provided inadequate guidance in its jury instructions and failed to ensure that the award to Ericsson comported with Ericsson's RAND commitments.

## CONCLUSION

If infringement liability is affirmed, the damages award should be vacated and remanded.

Respectfully submitted,

| PERKINS COIE LLP | MAYER BROWN LLP | BOIES SCHILLER & FLEXNER LLP |
|---|---|---|
| by  /s/Dan L. Bagatell | by  /s/Donald M. Falk | by  /s/Steven C. Holtzman |
| Dan L. Bagatell | Donald M. Falk | Steven C. Holtzman |
| Counsel for Amicus Broadcom Corporation | Counsel for Amicus Marvell Semiconductor, Inc. | Counsel for Amicus MediaTek Inc. |

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 30(d).  The brief contains 3,305 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2010 and 14-point Times New Roman type.

Dated:  December 23, 2013.           _____/s/Dan L. Bagatell_____

                                                          Dan L. Bagatell

                                           Attorney for Broadcom Corporation

## CERTIFICATE OF AUTHORIZATION AND PROOF OF SERVICE

In accordance with ECF-3(B), I certify that I am counsel of record for Broadcom Corporation and I obtained the authorization of counsel for Marvell Semiconductor, Inc. and MediaTek Inc. to include their electronic signatures on this brief.

In accordance with Federal Rule of Appellate Procedure 25 and Federal Circuit Rule 25, I further certify that I caused this brief to be served via the Federal Circuit's CM/ECF system on counsel of record for all parties.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  December 23, 2013, at Phoenix, Arizona.

                                                    /s/Dan L. Bagatell
                                                    Dan L. Bagatell